**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 9:24-cv-81080

IPN, LLC,

    Plaintiff,
v.

PURA VIDA WELLNESS, LLC,

    Defendant.
_____/

**COMPLAINT**

Plaintiff IPN, LLC d/b/a Paybotic files this Complaint against Defendant Pura Vida Wellness, LLC.

**INTRODUCTION**

1. Plaintiff brings this breach of contract action seeking principal damages of $480,510, plus costs and reasonable attorneys' fees.

**PARTIES**

2. Plaintiff is a Florida limited liability company with its principal address at 1800 S. Australian Avenue, Suite 400, West Palm Beach, FL 33409. Plaintiff's sole member, Maximilian Miller, is a citizen of Florida.

3. Defendant is a Maryland limited liability company with its principal address at 5806 York Road, Baltimore, MD 21212. Defendant's sole member, Matthew Blair, is a citizen of Maryland.

## JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on complete diversity between the parties, and the amount in controversy exceeds $75,000.

5. Plaintiff, inclusive of its member, is a citizen of Florida.

6. Defendant, inclusive of its member, is a citizen of Maryland.

7. This action is properly filed in the Southern District of Florida pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District, and the forum selection clause in the parties' written agreement designates this District as the exclusive forum.

8. The Court has personal jurisdiction over Defendant because Defendant entered into a written agreement specifying that Florida law governs and that the exclusive venue for any action shall be in the state and federal courts of Palm Beach County, Florida.

9. In the written agreement, Defendant waived any objections to jurisdiction and venue in this District.

10. Pursuant to Florida's long-arm statute, Fla. Stat. § 48.193, Defendant is subject to personal jurisdiction in this state for breaching the contract by failing to perform acts required by the contract to be carried out in Florida.

11. Pursuant to Florida's long-arm statute, Fla. Stat. § 48.193, Defendant is subject to personal jurisdiction in this state because Defendant entered into a contract that complies with Fla. Stat. §§ 685.101 and 685.102.

12. The transaction and transactions referenced in this action involve the aggregate consideration of more than $250,000 per Fla. Stat. § 685.101.

13. The Court's exercise of personal jurisdiction over Defendant satisfies Fla. Stat. § 685.102(1).

14. The Court's exercise of personal jurisdiction over Defendant satisfies the Due Process Clause of the United States Constitution.

15. Venue is appropriate in this Court.

## FACTS COMMON TO ALL ALLEGATIONS

16. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set out herein.

17. Plaintiff is a leader in the electronic payment processing industry, facilitating transactions between banks and merchants for the sale of cannabis products nationwide.

18. Plaintiff maintains essential relationships with a network of cannabis proprietors who utilize its payment processing services under contractual agreements.

19. Defendant operates as a cannabis merchant, offering a variety of cannabis products.

20. To facilitate customer purchases, Defendant sought to use Plaintiff's proprietary payment processing services.

21. On February 4, 2021, Plaintiff and Defendant entered into a written Merchant Processing Agreement (the "Agreement"). **Ex. A.**

22. Per Paragraphs 2.1, 2.5, and 5.1 of the Agreement, Plaintiff agreed to provide Defendant with electronic payment processing services, including the required equipment, for an initial 3-year term commencing on February 4, 2021, and ending on February 4, 2024 (the "3-Year Term"). *Id.*, ¶¶ 2.1, 2.5, 5.1.

23. Per Paragraph 2.2, Defendant agreed to use Plaintiff's services "on an exclusive basis" for the 3-Year Term of the Agreement. *Id.*, ¶ 2.2.

24. Per Paragraph 2.2, Defendant agreed that if it terminates the Agreement before the end of the 3-Year Term, or reduces the use of Plaintiff's services to pursue a payment processing relationship with an alternative provider, Defendant would present Plaintiff with a fee schedule outlining the rates proposed by the alternative provider and grant Plaintiff five business days from receipt of the fee schedule to match or better the proposed rates before any notice of termination would take effect. *Id.*

25. Per Paragraph 2.6, Defendant stipulated that Defendant's breach of the exclusivity requirements shall, *inter alia*, cause grave and irreparable damages to Plaintiff and entitle Plaintiff to five days' advanced notice and an opportunity to cure. *Id.*, ¶ 2.6.

26. Plaintiff and Defendant agreed that the actual damages to Plaintiff resulting from Defendant's early termination of the Agreement would be extremely difficult to calculate with precision, and would likely exceed the liquidated damages amount, and therefore the parties agreed that the liquidated damages calculation is a good faith, reasonable estimate of the potential actual damages to Plaintiff arising from Defendant's early termination, and it does not constitute a penalty. *Id.*, ¶ 5.4.

27. Per Paragraph 5.1, Plaintiff and Defendant agreed that the Agreement would automatically renew for successive 3-year terms unless either party provides written notice of its intent not to renew at least 90 days prior to the expiration of the current term. The renewal term is referred to as the "Renewal Term." *Id.*, ¶ 5.1.

28. Per Paragraph 5.4, Defendant agreed that if it breaches its exclusivity obligations before the end of the 3-Year Term or the Renewal Term, Defendant shall pay an Early Termination Fee as liquidated damages, calculated as the average monthly processing fee charged by Plaintiff

to Defendant over the previous six months, multiplied by the number of months remaining in the 3-Year Term or Renewal Term of the Agreement. *Id.*, ¶ 5.4.

29. Per Paragraph 5.5, upon termination of the Agreement, Defendant's obligations include, *inter alia*, payment of any applicable Early Termination Fee. *Id.*, ¶ 5.5.

30. Beginning in February 2021, Plaintiff and Defendant performed under the Agreement.

31. Plaintiff fully performed all its obligations under the Agreement.

32. On November 6, 2023, the deadline passed for either party to provide written notice of its intent not to renew, which was required 90 days prior to the February 4, 2024 expiration of the then-current term.

33. Accordingly, the Agreement automatically renewed for an additional 3-year term, beginning on February 4, 2024, and expiring on February 4, 2027 (the "Renewal Term").

34. On July 31, 2024, Defendant's agent informed Plaintiff that Defendant intended to terminate its processing relationship with Plaintiff in order to engage in payment processing services with another provider.

35. On August 1, 2024, a substantial reduction occurred in Defendant's daily processing, as Defendant had begun using a payment processor other than Plaintiff, in violation of the exclusivity provision outlined in Paragraph 2.2 of the Agreement.

36. In the six months prior to August 2024, the average monthly processing fee charged by Plaintiff to Defendant was $16,017.

37. On August 13, 2024, Plaintiff sent Defendant's principal a letter setting forth Defendant's obligation to pay the $480,510 Early Termination Fee, calculated as $16,017 multiplied by the 30 remaining months of the Renewal Term. **Ex. B.**

38. Defendant breached the Agreement by violating the exclusivity provision, as it failed to use Plaintiff's services on an exclusive basis as required under Paragraph 2.2.

39. Defendant breached the Agreement by using an alternative payment processing provider for the same services that Plaintiff provided under the Agreement.

40. Defendant breached the Agreement by failing to provide Plaintiff with a fee schedule outlining the rates proposed by the alternative provider, along with five business days for Plaintiff to match or better those rates, as required by Paragraph 2.2.

41. Defendant breached the Agreement by failing to provide Plaintiff with an opportunity to cure, as required under Paragraph 2.6

42. Defendant failed to cure its breach and has not paid the $480,510 Early Termination Fee.

43. Plaintiff has retained counsel and incurred costs and reasonable attorneys' fees, which are payable by Defendant per the prevailing party clause in the Agreement. Ex. A, ¶ 8.15.

## COUNT ONE – BREACH OF CONTRACT

44. Plaintiff incorporates by reference all the allegations in Paragraphs 1-43 of the Complaint as if fully set out herein.

45. A valid, enforceable contract exists between Plaintiff and Defendant, namely, the Agreement.

46. The Agreement is binding on both Plaintiff and Defendant.

47. Plaintiff has performed all contractual obligations owed to Defendant under the Agreement.

48. Plaintiff has fulfilled all conditions precedent, or such conditions have been waived or excused.

49. Defendant breached the Agreement by violating the exclusivity provision, failing to use Plaintiff's services exclusively as required under Paragraph 2.2.

50. Defendant breached the Agreement by using an alternative payment processing provider for the same services provided by Plaintiff under the Agreement.

51. Defendant further breached the Agreement by engaging an alternative payment processor instead of using Plaintiff's services during the Term of the Agreement.

52. Defendant breached the Agreement by failing to provide Plaintiff with a fee schedule outlining the rates proposed by the alternative provider, and by failing to give Plaintiff five business days to match or better those rates, as required by Paragraph 2.2.

53. Defendant breached the Agreement by failing to provide Plaintiff with an opportunity to cure, as required by Paragraph 2.6.

54. Plaintiff sent Defendant a letter outlining Defendant's obligation to pay the $480,510 Early Termination Fee; however, Defendant failed to remit payment as required under the Agreement.

55. Defendant breached the Agreement by failing to pay the $480,510 Early Termination Fee.

56. As a result of Defendant's breaches, Plaintiff has sustained liquidated damages in the amount of $480,510.

57. Defendant is responsible for payment of Plaintiff's costs and reasonable attorneys' fees under the prevailing party provision in Paragraph 8.15 of the Agreement.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant as follows:

A. Liquidated damages of $480,510;

B. Contract-based costs and reasonable attorneys' fees in an amount to be determined;

C. Prejudgment interest; and,

D. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

By: */s/ Kenneth E. Chase*
Kenneth E. Chase
Florida Bar No. 017661
kchase@chaselaw.com
Chase Law & Associates, P.A.
2700 North Military Trail, Suite 150
Boca Raton, FL 33431
Telephone: (305) 402-9800

*Attorneys for Plaintiff IPN, LLC*

# EXHIBIT A

# MERCHANT PROCESSING AGREEMENT
## Merchant Application and Fee Schedule

( • ) New Account  ( ) Additional Location  ( ) Change of Ownership

| Sales Office Name: | Office Code: | Application Date: |
|---|---|---|
| Sales Rep Name: | Phone Number: | Email: |

## BUSINESS INFORMATION

| MERCHANT Corporate/ Legal Name | MERCHANT Business Name: (Doing Business As) |
|---|---|
| PURA VIDA WELLNESS LLC | PURA VIDA WELLNESS |
| MERCHANT Corporate/Legal Address | MERCHANT Physical Address (No PO Box) [ ] check if same as legal address |
| 5806 YORK RD | 5806 YORK RD |
| City BALTIMORE  State MD  Zip 21212 | City BALTIMORE  State MD  Zip 21212 |
| Corporate Phone ( )   Fax ( ) | DBA Phone ( )   Fax ( ) |
| Contact Name  Matthew Blair | Contact Name |
| Federal Tax ID #    TIN Type: [✓] EIN  [ ] SSN | Business Email: |
| Tax Filing name (if different from Legal Name) | Multiple Locations? [ ] Yes  [✓] No   (If Yes, enter # of Locations) |

NOTE: Failure to provide accurate information may result in a withholding of merchant funding per IRS regulations

Does the Business have a valid state-issued regulatory or business license?
[ ] I certify that I am a foreign entity/non resident alien. If checked please attach IRS form W-8
[✓] Yes - License #    State    [ ] No   [ ] N/A

| TYPE OF MERCHANT: | [ ] PARTNERSHIP | [ ] PUBLIC CORP. | [ ] TAX EXEMPT CORP. | STATE FILED MD | BUSINESS START DATE (MM/DD/YYYY) |
|---|---|---|---|---|---|
|  | [ ] SOLE PROPRIETORSHIP | [ ] PRIVATE CORP. | [✓] LIMITED LIABILITY COMPANY | | |

Has this MERCHANT or any associated principals ever had any prior Bankruptcies? [ ] Yes [✓] No  [ ] Business and/or [ ] Personal  Date Discharged

Has this MERCHANT or any associated principals ever had a merchant relationship terminated? [ ] Yes [✓] No
If yes, please explain.

Has this MERCHANT or any associated principals ever been subject to any ongoing or previous investigations? [ ] Yes [✓] No
If yes, please explain.

Is this MERCHANT or any associated principals party to any claims or lawsuits? [ ] Yes [✓] No
If yes, please explain.

Has this MERCHANT or any associated principals ever violated the Bank Secrecy Act or other anti-laundering statute? [ ] Yes [✓] No

## Owner/Partner/Officer Information

| OWNER / PARTNER / OFFICER 1 | % Ownership: | OWNER / PARTNER / OFFICER 2 | % Ownership: |
|---|---|---|---|
| Name: (First, MI, Last) MATTHEW BLAIR | | Name: (First, MI, Last) | |
| Title: OWNER    Personal Email | | Title:    Personal Email | |
| Home Address: (No P.O. Box) | | Home Address: (No P.O. Box) | |
| City: Lutherville Timonium  State: MD  Zip: 21093  Country: USA | | City:  State:  Zip:  Country: | |
| Telephone #:    Social Security #: | | Telephone #:    Social Security #: | |
| D.O.B.:    DL #:    State: MD | | D.O.B.:    DL #:    State: | |
| Is the Owner/Partner/Officer a Politically Exposed Person (PEP)? [ ] Yes [✓] No | | Is the Owner/Partner/Officer a Politically Exposed Person (PEP)? [ ] Yes [ ] No | |

## Assurance of Application and Authorization to make inquiries

The above business and the undersigned Owner/Partner/Officer(s) ("MERCHANT") submitting this Merchant Processing Application ("Merchant Application") represent and warrant to IPN LLC ("Paybotic") that all information, data, and statements contained in, or submitted in connection with, the Merchant Application are true, correct and complete in all respects. MERCHANT further agrees to notify Paybotic in writing immediately of any and all changes that may occur from time to time regarding the information contained in the Merchant Application. MERCHANT acknowledges and agrees that Paybotic, and/or the applicable Financial Institution(s) associated with the Merchant Program(s) selected by MERCHANT, may make investigative background inquiries concerning MERCHANT as a business, and the named Owner/Partner/Officer(s) as individuals, as part of the merchant underwriting process. Inquiries may include investigative consumer reports, criminal, and other background checks and reports. These reports may include information as to the character, credit worthiness, and general reputation of MERCHANT, specifically including its Owner/Partner/Officer(s). Such inquiries may also be directed to federal, state, and local regulatory and law enforcement agencies. The undersigned hereby authorizes, without reservation, any party or agency contacted by Paybotic, Financial Institution and/or their agents to furnish the information described above.

X *Matthew Blair*   MATTHEW BLAIR   OWNER   2/4/2021
Owner/Partner/Officer 1 Signature   Name (please print)   Title   Date

X _____   _____   _____   _____
Owner/Partner/Officer 2 Signature   Name (please print)   Title   Date

# MERCHANT PROCESSING AGREEMENT

| Legal Name | PURA VIDA WELLNESS LLC | DBA Name | PURA VIDA WELLNESS | | | |
|---|---|---|---|---|---|---|
| **Non-Taxable Items** | | | Quantity | Unit Price | Amount | |
| Onboarding Fee (Per TID) | | | 1 | $75.00 | $75.00 | |
| Monthly Wireless Fee (Per TID) * | | | | $35.00 | | |
| Monthly Service Fee (Per TID) * | | | 1 | $10.00 | $10.00 | |
| Shipping Method | Ground | | | $20.00 | | |
| | 2-Day | | 1 | $40.00 | $40.00 | |
| | Standard Overnight | | | $90.00 | | |
| | | | Subtotal Non-Taxable Items | | $ | |
| **Taxable Items** | Purchase | Repro/Own | Quantity | Unit Price | Amount | |
| Dejavoo Z11 Terminal | ✔ | ☐ | 1 | $300 | FREE | |
| Dejavoo Z6 PIN Pad | ☐ | ☐ | | | | |
| Dejavoo Z9 WiFi/4G Terminal | ☐ | ☐ | | | | |
| Dejavoo Z9 WiFi Only Terminal | ☐ | ☐ | | | | |
| Other | ☐ | ☐ | | | | |
| | ☐ | ☐ | | | | |

*Fee will be charged immediately upon terminal deployment and thereafter on a recurring basis on or about the 1st day of the month.

| | | | | Tax % | | |
|---|---|---|---|---|---|---|
| | | | | Subtotal Taxable Items | $ | |
| | | | | Balance Due | $ | 0.00 |

| Terminal Communication Set Up | | ☐ Wifi | ✔ Ethernet |
|---|---|---|---|
| Shipping Address | | | |
| Who is responsible for payment? | | ✔ Rep/ISO | ☐ Merchant |
| Payment Type | | ✔ ACH | ☐ Check |

**Merchant Acceptance**

Merchant's Acceptance of Merchant Processing Agreement: MERCHANT understands and agrees that this Merchant Processing Agreement includes (a) the Merchant Application, (b) the Merchant Processing Terms and Conditions ("Terms and Conditions"), (c) all Supplemental Merchant Program Applications ("Supplemental Applications") completed by MERCHANT, if any, and (d) all Supplemental Terms and Conditions corresponding to any such Supplemental Merchant Programs selected by MERCHANT ("Supplemental Terms"), all of which are collectively referred to as the "Merchant Agreement" or "Agreement." MERCHANT represents and warrants to Paybotic that (i) Merchant has received and reviewed the Merchant Agreement in its entirety, including the complete Terms and Conditions and all applicable Supplemental Terms, prior to signing this Merchant Application, (ii) all information provided in, for, and with the Merchant Application, and any and all Supplemental Applications, is true and correct, (iii) Paybotic is properly authorized to investigate MERCHANT and each person listed on the Merchant Application as provided above, and (iv) the undersigned has the authority to bind MERCHANT by executing this Agreement. In the event the information and statements provided by MERCHANT in connection with the Merchant Application and/or any Supplemental Application proves to be false, incorrect and/or incomplete in any respect, MERCHANT shall indemnify, defend and hold Paybotic harmless against any resultant loss, liability or expense to Paybotic, including attorneys' fees and expenses. MERCHANT understands and agrees that the Merchant Agreement shall become effective only upon acceptance and approval of this Merchant Application by Paybotic, which shall be signified by MERCHANT's subsequent receipt of a Merchant ID ("MID") from Paybotic ("Paybotic Acceptance"). By signing below, MERCHANT hereby accepts and agrees to abide by the complete Terms and Conditions of this Agreement, and all Supplemental Terms applicable to this Agreement.

DocuSigned by:
X _Matthew Blair_____    MATTHEWBLAIR_____    OWNER_____    2/9/2021_____
   E985E5932E234C5...
Owner/Partner/Officer 1 Signature      Name                       Title              Date

Personal Guarantee: The undersigned ("Guarantor") does hereby personally guarantee to IPN LLC, as well as to its successors and assigns ("Paybotic"), the full, prompt and complete performance by MERCHANT of all of MERCHANT's obligations under this Agreement, including, but not limited to, the payment of credit losses, reversals and expenses in accordance with the Agreement, whether arising before or after termination of this Agreement. This guaranty is a guaranty of payment and not of collection, and is a debt of the Guarantor for his or her own account. Accordingly, Paybotic shall not be obligated or required before enforcing this guaranty against Guarantor: (a) to pursue any right or remedy Paybotic may have against MERCHANT, Guarantor or any other guarantor of these obligations or commence any suit or other proceeding against MERCHANT, Guarantor or any other guarantor; (b) to make any claim in a liquidation or bankruptcy of MERCHANT, Guarantor or any other guarantor; or (c) to make demand of the MERCHANT, Guarantor or any other guarantor to enforce or seek to enforce or realize upon any collateral security held by Paybotic. This guaranty shall not be discharged or otherwise affected by any waiver, indulgence, compromise, settlement, extension of credit, or variation of terms of this Agreement made or agreed to by Paybotic or MERCHANT. Guarantor hereby waives any notice of acceptance of this guaranty, notice of non-payment or non-performance of any provision of the Agreement by MERCHANT, and all other notices or demands regarding the Agreement. Guarantor agrees to promptly provide to Paybotic any information reasonably requested from time to time.

X _____  _____  _____  _____
(please print)                      as individual Guarantor Name    Signature                Date

# MERCHANT PROCESSING AGREEMENT
## Merchant Application and Fee Schedule

**Legal Name:** PURA VIDA WELLNESS LLC  **DBA Name:** PURA VIDA WELLNESS

### Banking Information

| Field | Value | Field | Value |
|---|---|---|---|
| Financial Institution Name | [redacted] | Phone | | Fax | |
| Name on Account | Pura Vida Wellness LLC | Type of Account: | ☑ Checking   ☐ Saving |
| Bank Routing Number | [redacted] | Bank Account Number | [redacted] |

### Schedule of Fees

| | |
|---|---|
| Transaction Fee $ 2.95 | Onboarding Fee (Key Setup - per Key) $ 75.00 |
| ☑ bill to Customer $ 2.95   ☐ bill to Merchant $ | Monthly Platform Fee (per Terminal) $ 10.00 |
| Decline Fee per transaction $ 1.00 | |
| Chargeback Fee per chargeback $ 45.00 | Monthly Wireless Fee (per Terminal) $ 35.00 |

### General Set Up for Reporting Portal

Contact Name:  
Title:  
Contact Telephone#:  
Contact email:  

**ACH Authorization Release** _MB_ (DS) Owner/Partner/Officer Initials

The undersigned authorizes Paybotic and its authorized processors to credit or debit its account for the following items: DAILY TRANSACTION SETTLEMENT, SETTLEMENT ERROR CORRECTIONS, ADJUSTMENTS, FEES, and INCOME DISTRIBUTION. The credits and debits pursuant to this Agreement will be effected through the Federal Reserve Automated Clearing House system. Customer shall audit and balance the data contained in the periodic statements and reports provided by Paybotic, and/or third party authorization and shall promptly, but in no event more than 30 days after the date of the disputed item, notify Paybotic, and/or third party authorization in writing (the "Notice Date") of any disputed item or items on such periodic statements and reports. If Paybotic, and/or third party authorization determines that the disputed item was credited or debited in error by Paybotic, and/or third party authorization, they shall correct the error. Notwithstanding, Paybotic, and/or third party authorization, shall not be liable for any recovery, reimbursement or otherwise of any amounts over 30 days from the Notice Date. Paybotic, and/or third party authorization will, however, use its commercially reasonable efforts to recover any amounts over such 30-day period. Paybotic, and/or third party authorization, shall not be liable for any damages, interest or costs associated with the error other than correcting the error.

### Merchant Acceptance of Debit Processing Program

"Agreement" in this section means the "Merchant Processing Agreement". The Merchant Processing Agreement is between IPN LLC ("Paybotic") and the Merchant named above ("Merchant"). Merchant represents that it has the authority to provide information to and execute the Agreements. Merchant understands that the Agreements bind Merchant's business and Merchant individually. Merchant has read and agrees to the terms of this Merchant Processing Agreement ("Agreement") consisting of this entire document. In connection with Merchant's Application for Processing Services, Merchant understands that Paybotic may make investigate background inquiries concerning the Merchant individually and concerning Merchant's business. Inquiries may involve some or all of the following: consumer reports, investigate consumer reports, criminal, and other reports. These reports may include information as to character, credit worthiness, general reputation, personal characteristics, mode of living, work habits, performance, and experience along with reasons for termination of past employment from previous employers. Further, Merchant understands that Paybotic may be requesting information from various federal, state, and other agencies that maintain records concerning my past activities to my credit, criminal, civil and other experiences as well as claims from the insurance companies' files that involve me. The undersigned authorizes, without reservation, any party or agency contacted by Paybotic or its agent to furnish the information described above. A copy of the Merchant Processing Agreement Universal Terms and Conditions, Rev. Paybotic 04/20, a copy of the Debit Processing Program Supplemental Terms and Conditions, Rev. Paybotic 04/20 have been provided to Merchant (collectively, the "Terms and Conditions"). Merchant's signature below signifies and agreement with all of the Terms and Conditions therein. If this Merchant Application is accepted for services, Merchant agrees to comply with the Merchant Application and the Terms and Conditions as may be modified and amended in the future. Merchant understands that the Agreements will become effective upon acceptance by Paybotic through the assignment to Merchant of a Merchant Terminal Identification Number. By signing below as the Merchant or on Merchant's behalf, the undersigned guarantees to Paybotic the performance of this Merchant Processing Agreement and any Addendum thereto by Merchant, including payment of all sums due and owing and any attorney's fees and costs associated with enforcement of the terms thereof. Paybotic will not be required to first proceed against Merchant or enforce any other remedy before proceeding against the undersigned. This is a continuing guarantee and will not be discharged or affected by the death of the undersigned, and will bind the heirs, administrators, representatives, and assigns and may be enforced by or for the benefit of any successor of Paybotic.

| | | | |
|---|---|---|---|
| X _Matthew Blair_ (DocuSigned, E985E5932E234C5...) | MATTHEWBLAIR | OWNER | 2/4/2021 |
| Owner/Partner/Officer 1 Signature | Name (please print) | Title | Date |

**SPECIAL INSTRUCTIONS** _____

## MERCHANT PROCESSING TERMS AND CONDITIONS

This Merchant Agreement, specifically including the Merchant Processing Application, these Merchant Processing Terms and Conditions and the DEBIT Processing Agreement ("**Merchant Agreement**" or "**Agreement**"), is made by IPN LLC, a Florida Corporation, with office at 120 South Dixie Highway, Unit 201, West Palm Beach, FL 33401 ("**Paybotic**"), and the Merchant authorizing this Agreement, as identified on the Merchant Application ("**MERCHANT**"), each individually a ("**Party**") and collectively ("**Parties**"), effective upon the "**Effective Date**," as defined below.

**1. Merchant Agreement and Acceptance**

**1.1 Merchant Information.** Upon receipt of the fully completed Merchant Processing Application ("**Merchant Application**") and any Supplemental Merchant Program Applications ("**Supplemental Application(s)**") from MERCHANT, Paybotic shall determine whether to approve the Application(s) and provide the products and or services requested by MERCHANT by investigating and underwriting MERCHANT using the Information and statements contained in or submitted with the Application(s). MERCHANT understands and agrees that Paybotic may rely on said information and statements as being true, accurate and complete in all respects; and may also request additional information from MERCHANT to confirm the veracity of such information, and assess MERCHANT's current financial condition, from time to time. MERCHANT shall promptly comply with any such request for additional information within the time period prescribed by Paybotic.

**1.2 Paybotic Acceptance.** MERCHANT understands and agrees that the Merchant Application is subject to Paybotic Acceptance as defined below. Paybotic will confirm acceptance by providing MERCHANT with a Merchant Identification code ("**MID**"), and MERCHANT may begin processing transactions upon its receipt of the MID. The MID will be programmed into the equipment provided by Paybotic; or Paybotic will provide MERCHANT with instructions containing the MID along with programming guidelines for the terminal or MERCHANT's existing point of sale system or platform to be used in connection with the services ("**Paybotic Acceptance**").

**1.3 Merchant Acceptance.** MERCHANT understands, acknowledges and agrees that, by submitting the Merchant Application to Paybotic and beginning to process transactions through the MID, MERCHANT unequivocally agrees to abide by and be bound by the Merchant Agreement in its entirety, specifically including these Terms and Conditions, and all applicable Supplemental Terms. The Effective Date of this Merchant Agreement shall be the earlier of (a) the date of the Paybotic Acceptance of a Merchant Application, or (b) the date on which MERCHANT submits its first transaction for processing through the MID ("**Effective Date**").

**1.4 Processing Sponsor**. Each Merchant Program selected by MERCHANT is associated with a processing sponsor that is under contract with Paybotic. Each processing sponsor uses unique terminology to identify itself, such as, Sponsor Bank, Member Bank, Originator's Depository Financial Institution, etc. (herein collectively referred to as "**Sponsor**"). Transactions submitted by MERCHANT to Paybotic are electronically processed through one or more Sponsors.

**1.5 Merchant Representations and Warranties.** Merchant represents and warrants to Paybotic at the time of execution and throughout the term of this Agreement that:

**1.5.1** All information contained in the Merchant Application, Supplemental Application(s), and any other documents delivered to Paybotic in connection therewith is true and complete and properly reflects MERCHANT's business, address, financial condition, and principal partners, owners or officers.

**1.5.2** MERCHANT has the power to execute, deliver and perform this Agreement, and this Agreement is duly authorized and does not violate any provisions of any law or regulation to which MERCHANT is subject.

**1.5.3** MERCHANT has all licenses required to conduct its business, is qualified to do business in every jurisdiction where such qualification is required, and does not sell any goods or services prohibited under the laws of the jurisdiction in which MERCHANT is located, or any jurisdiction in which MERCHANT offers goods or services to consumers.

**1.5.4** MERCHANT fully complies with the personal data protection laws of the jurisdiction in which MERCHANT is located and every jurisdiction in which MERCHANT markets its goods and services to consumers, and covenants to implement appropriate technical and organizational measures as necessary to ensure protection of personal data and remain in compliance with applicable personal data protection laws at all times during the term of this Agreement.

**1.5.5** MERCHANT provides consumers with all disclosures and other information required by the Federal Trade Commission Act, Restore Online Shoppers Confidence Act, and every other consumer protection law applicable in the jurisdiction in which MERCHANT is located and in which MERCHANT offers goods or services to consumers.

**1.5.6** MERCHANT respects the intellectual property rights of third parties, does not and will not infringe such rights in any way, and upon becoming aware of any infringement of such rights will immediately terminate such infringement.

**1.5.7** There is no action, suit or proceeding now pending, or to MERCHANT's knowledge, threatened by or against or affecting MERCHANT, that would substantially impair its right continue its business or adversely affect its financial condition or operations.

**1.5.8** Each transaction submitted to Paybotic for processing is genuine, is the result of a bona fide card transaction for the purchase of goods or services by the cardholder in the total amount stated on the sales draft, and is not the result of any fraudulent transaction, or being submitted on behalf of any business other than MERCHANT.

**1.5.9** MERCHANT has performed, or will timely perform, all of its obligations to each cardholder in connection with each card transaction, including but not limited to accepting responsibility for the acceptance of a cardholder order, its fulfillment in an agreed upon manner, and all material warranties, guarantees and order commitments.

**1.5.10** MERCHANT will comply with Paybotic's procedures for accepting cards, and will ensure that no card transaction submitted by MERCHANT involves any element of credit or debit for any purpose other than as set forth in this Agreement, and is subject to any defense, dispute, offset or counter claim which may be raised by any cardholder.

**1.5.11** Unless MERCHANT notifies Paybotic in writing (either on the Merchant Application or otherwise), no other processing relationship exists between MERCHANT and any other merchant processor for the business subject of this Agreement, or any other business run or owned by MERCHANT.

**1.5.12** With respect to all card transactions that MERCHANT requests Paybotic to originate, MERCHANT continuously represents and warrants to Paybotic that: (i) each customer has authorized the debiting and/or crediting of its account; (ii) each entry is for an amount the customer has agreed to; and (iii) each entry is in all other respects properly authorized.

**1.5.13** MERCHANT fully complies with all applicable Payment Card Industry Data Security Standards ("**PCI-DSS**") and Payment Application Data Security Standards ("**PA-DSS**").

**1.6 Change in Merchant's Business.** MERCHANT shall provide Paybotic with immediate notice of intent to: (a) Transfer or sell any substantial part of its total assets, or liquidate those assets; (b) Change the basic nature of its business, including selling any products or services not related to its current business; (c) Change more than twenty five percent (25%) ownership interests or transfer control of its business; or (d) Enter into any joint venture, partnership or similar business arrangement whereby any person or entity not a party to this Agreement assumes any interest in MERCHANT's business. Failure to provide notice as required herein may be deemed a material breach of the Merchant Agreement, and shall be sufficient grounds for Paybotic to immediately terminate the Agreement. In the event any of the changes listed above should occur, Paybotic may renegotiate the terms of this Agreement or immediately terminate this Agreement upon notice to MERCHANT.

**1.7 Agreement Modification.** The specifications, operating procedures, and processes ("**Operations**") described in this Merchant Agreement are provided to help facilitate the timely administration of the Merchant Program(s) set forth herein. Paybotic may amend the Merchant Agreement from time to time in its sole discretion. Such amendments may include, but are not limited to, changes in Operations, Merchant Program Rules, and any other provisions of this Agreement. Such amendments shall become effective upon written notice to MERCHANT via the contact information provided by MERCHANT in the Merchant Application, or such later date as may be stated in Paybotic's notice to the MERCHANT, and MERCHANT will be deemed to accept any such amendments by continuing to process transactions through the MID after MERCHANT's receipt of such notice.

**2.0 Exclusivity.**

**2.1 Platform.** Paybotic provides a proprietary platform to provide electronic payment services (the "**Platform**") for and on behalf of one or more Sponsors and/or processors (collectively, the "**Vendors**"), and Paybotic is offering the Platform to dispensaries in the cannabis market (the "**Market**"). The Platform currently provides Point-of-Banking PIN Debit payment services, directly or indirectly, for merchants in the Market, and when available will also provide debit, credit and other payment services in the Market, directly or indirectly (the "**Services**").

**2.2 Exclusive Relationship.** The relationship created by this Agreement is an exclusive relationship for the Market, and MERCHANT agrees to use the Services in the Market on an exclusive basis. Except as disclosed to Paybotic in writing on or before the Effective Date ("**Prior Relationships**"), MERCHANT is not presently a party to any contract for services in the Market similar to or competing with the Services besides this Agreement, and MERCHANT warrants and covenants that, for so long as this Agreement remains in effect, MERCHANT shall not contract with any merchant service provider other than Paybotic for services in the Market similar to or competing with the Services. Notwithstanding anything to the contrary herein, MERCHANT shall terminate its Prior Relationships, or if that is not possible MERCHANT may maintain its Prior Relationships for their current term, but MERCHANT agrees that MERCHANT shall immediately discontinue the services provided to MERCHANT through such Prior Relationships as of the Effective Date. MERCHANT shall not enter into a new contract with any party other than Paybotic for services similar to or competing with the Services, without Paybotic's prior written consent, which consent may be withheld in Paybotic's sole discretion. If MERCHANT ends any Prior Relationship MERCHANT shall not replace the services from such Prior Relationship except through Paybotic. In the event MERCHANT terminates this Agreement before the end of the Term or stops or reduces the use of the Services in order to pursue a payment processing relationship with a merchant service provider other than Paybotic (an "**alternative provider**"), MERCHANT agrees to present Paybotic with a fee schedule setting forth the rates proposed by the alternative provider, and grant Paybotic five (5) business days from Paybotic's receipt of the fee schedule to match or better the rates proposed by the alternative provider in an effort to retain MERCHANT before such notice of termination may take effect. Notwithstanding the foregoing, MERCHANT may contract with backup processing service provider(s) (including Prior Relationships), and any use of such backup providers if the Services have been down for more than 48 hours shall not constitute a breach of the Agreement. Once Paybotic provides MERCHANT with notice that the Services have been reinstated, the MERCHANT will be contractually obligated to begin using the Services and discontinue the use of any similar or competing processing services as soon as commercially practicable but in no event greater than 2 business days beyond notification by Paybotic. MERCHANT shall work with Paybotic to load any new Keys on terminals in order to re enable the Services. If MERCHANT fails to load keys within 48 hours of being provided such keys by Paybotic then MERCHANT will be in default of the Agreement.

**2.3 Added Services Exclusivity.** The exclusivity and all other rights and obligations under Section 2.2 shall extend to all new services added to the Services during the Term, such as debit, credit and other payment services (the "**Added Services**"), on a going forward basis. With respect to the other sections of this Agreement, the Added Services shall be deemed to be included in the Services. If required by Sponsors or Paybotic, MERCHANT shall contract to use the Added Services through Paybotic. If MERCHANT has a Prior Relationship for any of the Added Services at the time the Added Services are live on the Platform (the "**Added Services Live Date**"), then MERCHANT shall comply with the Prior Relationship obligations under Section 2.2 as of the Added Services Live Date; provided that, during the Term, MERCHANT shall not enter into a new contract with any party other than Paybotic for services similar to or competing with the Added Services.

**2.4 Backup Processing.** Notwithstanding the foregoing, MERCHANT may contract with backup processing service provider(s), and use of such backup providers if the Services have been down for more than 48 hours, without being in breach of this Agreement. Once Paybotic provides MERCHANT with notice that the Services have been reinstated, MERCHANT shall begin using the Services and discontinue the use of any backup processing services as soon as commercially practicable but in no event greater than 2 business days beyond notification by Paybotic. MERCHANT shall work with Paybotic to effectuate the loading of any new Keys on terminals in order to re-enable the Services. If MERCHANT fails to load keys within 48 hours of being provided such keys by Paybotic then MERCHANT will be in default of this Agreement.

**2.5 Terminals.** Payment terminals approved by Paybotic, in its sole discretion, shall be the only terminals connected to the Platform or used with the Services.

**2.6 Breach of Exclusivity.** MERCHANT agrees and understands that any breach of its obligations under this Section 2.0 shall: (i) cause grave and irreparable damages to Paybotic; and (ii) entitle Paybotic, in its sole discretion and with five (5) days advance notice and an opportunity to cure, in addition to any other rights or remedies that Paybotic may have, to do any or all of the following: (a) suspend, restrict or terminate Services; and/or (b) terminate the Merchant Agreement. The time periods referred to in this Section 2.0 shall be stayed and extended during any violation or breach of the terms of this Section.

**2.7 Interpretation.** In the event that any court shall finally hold that the time, territory or any other provision of this Section 2.0 constitutes an unreasonable restriction against MERCHANT, MERCHANT agrees that the provisions hereof shall not be rendered void but shall apply as to such time, territory and other extent as such court may judicially determine constitutes a reasonable restriction under the circumstances involved. Paybotic and MERCHANT each request that any such court make a determination of what would constitute a reasonable restriction under the circumstances involved and to reform this Agreement accordingly. This Section 2.0 shall survive termination of this Agreement and shall inure to the benefit of Paybotic, its successors and assigns.

**3 Financial Matters**

**3.1 Merchant Bank Account(s).** MERCHANT shall designate one or more direct deposit accounts ("DDA") as its Merchant Bank Account in the Merchant Application ("**Merchant Bank Account**"). In the event MERCHANT wishes to have more than one Merchant Bank Account, MERCHANT shall submit a voided check for each additional DDA with the Merchant Application, stating the reason for designating each such DDA as an additional Merchant Bank Account on the face of the voided check. MERCHANT shall authorize Paybotic to make debit and credit entries through Automated Clearing House ("ACH") to each Merchant Bank Account. Paybotic may, without prior notice or demand, obtain payment of any amount due and payable to Paybotic under the Agreement by debiting the Merchant Bank Account. MERCHANT shall at all times maintain a balance of available funds in the Merchant Bank Account sufficient to cover MERCHANT's payment obligations under this Agreement, and shall immediately comply with any advance payment instructions from Paybotic. In the event there are insufficient funds in the Merchant Bank Account to cover MERCHANT's obligations under this Agreement, MERCHANT agrees (a) that Paybotic may debit such amount from any account maintained by MERCHANT with Paybotic or any affiliate of Paybotic, and/or (b) that Paybotic may set off such amount against any amount Paybotic may otherwise owe to MERCHANT, in order to obtain payment of MERCHANT's obligations under this Agreement. MERCHANT shall not close or change any Merchant Bank Account without first advising Paybotic and providing Paybotic with updated banking information in advance. MERCHANT shall be solely liable for all fees and costs associated with the Merchant Bank Account and for all overdrafts thereof as per the fee schedule contained in this Agreement. This provision shall survive termination of this Agreement for any reason.

**3.2 Merchant Program Service Fees.** MERCHANT shall pay all service fees and charges provided for in this Merchant Agreement, the Merchant Application, the Terms and Conditions, and any Supplemental Application(s), Supplemental Terms, and/or additional agreed upon pricing addenda.

**3.3 Fines.** MERCHANT agrees to be liable for any and all fines assessed against Paybotic by any card association, network, or federal, state or local regulating body in connection with MERCHANT's processing activity under this Agreement. MERCHANT will immediately reimburse Paybotic for any fine amount upon notification by Paybotic of such fines.

**3.4 Taxes.** MERCHANT shall be responsible for payment of any sales, use, excise, value-added, utility or other similar taxes relating to the services provided for herein.

**3.5 Fee Modifications.**

**3.5.1 Change in Assumptions; Risk.** The service fees provided for in this Agreement are based on assumptions associated with the anticipated annual volume and average transaction size for the services contemplated by this Agreement, the Merchant Application, and MERCHANT's method of doing business. If the actual gross volume or average transaction size in dollars are not as represented and expected, or if MERCHANT significantly alters its method of doing business resulting in changes to such representations, Paybotic may adjust MERCHANT's transaction fees without prior notice. MERCHANT acknowledges that Paybotic has assumed certain risks by entering into this Merchant Agreement. Accordingly, MERCHANT understands and agrees that Paybotic may modify the fees payable by MERCHANT under this Agreement from time to time pursuant to Paybotic's continuing underwriting of the MERCHANT.

**3.5.2 Change in Underlying Costs.** Paybotic may modify the fees payable by MERCHANT under this Agreement from time to time to pass through to MERCHANT any increase or decrease in costs associated with third party service providers engaged by Paybotic to assist in performance of the services required by the Merchant Program(s) selected by MERCHANT. Such service fees include, but are not limited to, card association/network interchange rates, assessments, dues, fees, online communications, vault cash, and similar items. All such fee adjustments shall be MERCHANT's responsibility to pay and shall become effective upon the date any such change is implemented by the applicable third party service provider.

**3.5.3 Change by Regulation.** Paybotic may modify the fees payable by MERCHANT under this Agreement from time to time to pass through to MERCHANT the financial, economic and regulatory effects of any present or future federal, state or local statute, regulation or government policy, including increasing fees due from MERCHANT or reducing compensation due to MERCHANT.

**3.6 Security Interest.** To secure all obligations of MERCHANT to Paybotic arising from this Agreement, Merchant hereby grants Paybotic a first lien security interest in all deposits, regardless of source, to Merchant Bank Account(s), as well as any other bank account established by MERCHANT in accordance with this Agreement, and all amounts related to MERCHANT's processing activity in the possession or control of Sponsor or Paybotic, including MERCHANT receivables in connection with this Agreement. Paybotic may exercise its rights under this security interest without notice or demand of any kind by making an immediate withdrawal from said Merchant Bank Account(s), any other bank account, and/or the processing proceeds otherwise due MERCHANT, upon Paybotic's determination that MERCHANT has breached any obligation to Paybotic, and such rights shall be in addition to all other rights of Paybotic under this Agreement. MERCHANT agrees to execute any control agreements or other documents, and to perform any other action, required in order to comply with and perfect the security interest. Anytime there is an obligation owing from MERCHANT to Paybotic may offset any such amounts against any deposit balances or other money then owed MERCHANT by Paybotic, without notice or demand of any kind. The security interests granted under this Agreement shall survive termination of this Agreement until MERCHANT satisfies all obligations to Paybotic.

**4. Warranty, Liability and Indemnification**

**4.1 Disclaimer of Warranty.** THIS AGREEMENT IS A SERVICES AGREEMENT. PAYBOTIC DISCLAIMS ALL OTHER REPRESENTATIONS OR WARRANTIES MADE TO MERCHANT OR TO ANY OTHER PERSON. EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, PAYBOTIC MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY OF THE PAYBOTIC SERVICES, RELATED PRODUCTS, SOFTWARE OR DOCUMENTATION. PAYBOTIC SPECIFICALLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION, ANY AND ALL WARRANTIES REGARDING QUALITY, SUITABILITY, MERCHANT ABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE OF ANY SERVICES OR ANY GOODS PROVIDED INCIDENTAL TO THE SERVICES PROVIDED UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, ANY SERVICES OR ANY GOODS PROVIDED BY A THIRD PARTY.

**4.2 Limitation of Liability.** IN NO EVENT SHALL PAYBOTIC, ANY PAYBOTIC AFFILIATE, SPONSOR, OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS, BE LIABLE TO MERCHANT, OR ANY PARTY CLAIMING BY, THROUGH, OR UNDER MERCHANT, FOR ANY INCIDENTAL, EXEMPLARY, PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES WHATSOEVER, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE, OR WHETHER ANY PARTY OR ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. PAYBOTIC IS NOT LIABLE TO MERCHANT FOR ACCOUNT NUMBER VERIFICATION SERVICE ERRORS, AND SHALL NOT BE LIABLE TO MERCHANT OR ANY THIRD PARTY FOR ANY LOSS AND/OR DAMAGE CAUSED OR SUFFERED BY THE MERCHANT AND/OR SUCH THIRD PARTY I CONNECTION WITH ANY UNAVAILABILITY OF THE SERVICES CONTEMPLATED BY THIS AGREEMENT. PAYBOTIC ASSUMES NO LIABILITY FOR DISRUPTIONS OR IMPROPER OPERATION OF THE SERVICE FOR ANY REASON, INCLUDING, BUT NOT LIMITED TO, VANDALI SM, THEFT ACTIONS OF THIRD PARTY SERVICE PROVIDERS, PHONE SERVICE OUTAGES, INTERNET DISRUPTIONS, EXTREME OR SEVERE WEATHER CONDITIONS OR ANY OTHER CAUSES IN THE NATURE OF "ACTS OF GOD" OR FORCE MAJEURE. IN NO EVENT SHALL THE TOTAL AGGREGATE LIABILITY OF PAYBOTIC FOR ANY AND ALL CLAIMS, LOSSES OR DAMAGES ARISING UNDER THIS AGREEMENT EXCEED THE TOTAL AMOUNT OF FEES ACTUALLY PAID TO PAYBOTIC BY MERCHANT DURING THE THREE (3) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT THAT GAVE RISE TO THE CLAIM, LOSS OR DAMAGE, OR TEN-THOUSAND DOLLARS (USD10,000), WHICHEVER IS GREATER, WHETHER OR NOT THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN OR CONTEMPLATED BY PAYBOTIC OR THE PROCESSING SPONSOR, AND REGARDLESS OF THE LEGAL OR EQUITABLE THEORY OF LIABILITY WHICH MAY BE ASSERTED.

**4.3 Indemnity.** MERCHANT shall defend, indemnify and hold harmless Paybotic, Sponsor, and their respective officers, directors, agents, and employees (each an "**Indemnitee**") from and against any and all claims, demands, actions, losses, liabilities, damages, recoveries, settlements, costs or expenses (including but not limited to those arising from fraud or similar activities, whether or not MERCHANT participated in any way), including but not limited to investigation expenses, research time, attorney's fees, accountant and expert witness fees and costs, and other costs of defense, whether or not provided by Paybotic or Sponsor's personnel or others (collectively "**Claim**"), known or unknown, contingent or otherwise, arising directly or indirectly out of or in connection with this Agreement, the duties to be performed by MERCHANT pursuant to this Agreement, any transactions that MERCHANT submits to Paybotic, or MERCHANT's violation of any applicable law. In the event that Paybotic and/or Sponsor shall be made a party to any litigation, proceeding, arbitration, bankruptcy proceeding, or other legal process (collectively "**Actions**") commenced by any third party arising out of or resulting from or in connection with MERCHANT's business activities, products or services, contractual relationships, promotions, advertising, and/or any alleged act of libel, slander, infringement or other violation of any third party's copyright, trademark or other intellectual property rights by MERCHANT or any subcontractor or agent of MERCHANT, MERCHANT shall defend, indemnify and hold harmless Paybotic and/or Sponsor from and with respect to the Actions and shall pay all costs, expenses, and attorney's fees incurred or paid in connection with the Action, together with any judgments rendered. MERCHANT shall defend, indemnify and hold harmless Paybotic and/or Sponsor for any hacking, infiltration, or compromise of MERCHANT's systems or the systems of MERCHANT's servicers, designated representatives, or other agents. MERCHANT will pay on a pass through basis any and all fines and penalties assesse against Paybotic or Sponsor in connection with MERCHANT or MERCHANT's activities.

**5 Term and Termination**

**5.1 Term.** The initial Term for all services under this Agreement shall be for a period of three (3) years beginning on the Effective Date of the Merchant Agreement (the "**Initial Term**"), and shall automatically renew for additional successive three (3) year terms ("**Renewal Term**") unless any Party hereto provides the other written notice of its intent not to renew ninety (90) days prior to the expiration of the then-current Term. The Initial Term together with each Renewal Term shall be referred to herein as the "**Term**".

**5.2 Termination for Cause.** Either Party shall have the right to terminate this Agreement for cause, effective immediately, if the other Party has caused an Event of Default (defined below), or is otherwise in default of any material obligation under this Agreement and fails to cure such default within thirty (30) days following written notice from the other Party, or if the other Party is declared bankrupt, files a voluntary petition under any bankruptcy laws, has a receiver appointed for all or substantially all of its property, or makes an assignment of all or substantially all its assets to creditors. MERCHANT shall be subject to an Early Termination Fee in the event that Paybotic terminates the Agreement for cause.

**5.3 Event of Default.** Each of the following occurrences will constitute an "**Event of Default**" under this Agreement:

**5.3.1 False Representation.** If any representation or warranty made by a Party or any of its employees, officers, or directors proves to have been false or misleading in any material respect as of the date made, or becomes materially false or misleading at any time, and MERCHANT does not correct such false or misleading information within fifteen (15) days of notice from Paybotic.

**5.3.2 Regulatory Breach.** If MERCHANT is in material breach of Vendor rules or applicable laws, then Paybotic may terminate this Agreement immediately for cause and without opportunity for MERCHANT to cure such breach.

**5.3.3 Breach.** If either Party fails to observe any material obligation specified in this Agreement, and such failure is not cured within fifteen (15) days of receipt of written notice thereof from the non-breaching Party, then the notifying Party may terminate this Agreement with notice to the defaulting Party. Notwithstanding the previous sentence, (i) the fourth such breach by MERCHANT will be deemed an

Event of Default by MERCHANT without notice or the opportunity to cure; and (ii) in the event that Paybotic determines that a breach by MERCHANT is not reasonably capable of being cured, then no advance notice or opportunity to cure shall be provided to MERCHANT notwithstanding any provision herein to the contrary.

**5.4  Early Termination Fee**. In the event that Paybotic terminates the Merchant Agreement for cause, or MERCHANT breaches its exclusivity obligations, prior to the end of the Term, then MERCHANT shall pay an Early Termination Fee as liquidated damages in an amount equal to: (i) the average monthly processing fees charged to MERCHANT for the previous six (6) months (or such shorter time if the MERCHANT has processed for less than six (6) months) multiplied by the number of months remaining in the Term. The Early Termination Fee shall apply to each Merchant Program in effect between Paybotic and MERCHANT. MERCHANT and Paybotic agree that the actual damages to Paybotic resulting from the early termination of this Agreement would be extremely difficult to calculate with precision, and would likely exceed this liquidated damages amount, wherefore the Parties hereto agree that the liquidated damages calculation provided for herein represents a good faith, reasonable estimate of the potential actual damages to Paybotic arising from the early termination of this Agreement, and does not constitute a penalty. Such liquidated damages are in addition to and separate from any indemnity obligations by MERCHANT for any liability that may be incurred by Paybotic related to MERCHANT's processing activity, and any other service fees that may be owed by MERCHANT under this Agreement. Notwithstanding the above, if MERCHANT terminates their agreement with ISO and does not execute a new agreement for similar services within 12 months from date of termination then the above early termination fees will be waived.

**5.5  Effect of Termination**. Upon termination of this Agreement for any reason, MERCHANT's obligations shall include, but not be limited to, (a) payment of all applicable fees and charges for any services performed by Paybotic prior to the effective date of termination; (b) payment of any applicable Early Termination Fee; (c) payment of all costs and expenses incurred to collect amounts owed by MERCHANT to Paybotic; and (d) payment of any subsequent returned items from MERCHANT's use of the services. MERCHANT shall continue to bear total responsibility for all chargebacks, fees, credits and adjustments resulting from card transactions processed pursuant to this Agreement, and all other amounts then due, or which thereafter may become due, under this Agreement. Paybotic may hold MERCHANT's funds for a period of time in an amount sufficient to cover said financial obligations from the final deposit to the Merchant Bank Account. Within thirty (30) days of termination of this Agreement, MERCHANT shall return to Paybotic all materials that are the property of Paybotic and provided by Paybotic to MERCHANT, as part of the services contemplated hereunder, including, but not limited to software, hardware, manuals and instructions.

**6  Confidentiality.** Each Party acknowledges and agrees that it may obtain certain confidential information from the other in connection with this Agreement, including without limitation information about the Services, Platform, and Vendors. Such information includes, but is not limited to pricing, technical information, operating procedures, and other information pertaining to the business and customers of each Party ("Confidential Information"). Such Confidential Information does not include: (a) information that is publicly available; (b) information received from a third party not in violation of any confidentiality obligation; (c) information already known by the receiving Party at the time of disclosure, and (d) independently developed information. Each Party agrees: (i) to maintain the confidentiality of the other's Confidential Information, using efforts no less protective than such Party uses to in the protection of its own information; (ii) not to disclose such information to any third party, except auditors and regulators, or as otherwise required by law or directed by the disclosing Party; (iii) not to use such information for any purpose whatsoever other than its performance hereunder; (iv) to return all Confidential Information to the other Party upon request. The Parties shall not disclose any Confidential Information to any third party unless required for the purposes of carrying out their obligations under this Agreement or as required by law. Notwithstanding anything in this Agreement to the contrary, either Party may disclose to third parties the fact that MERCHANT is contracting with Paybotic for merchant services. MERCHANT acknowledges and agrees that the merchant services and documentation provided to MERCHANT under this Agreement are and contain the valuable, confidential and trade secret information of Paybotic. **7  Personal and Cross-Corporate Guaranty.** As an express condition precedent to this Agreement, and prior to furnishing any service or benefit to MERCHANT hereunder, Paybotic shall require an independent Personal Guaranty of MERCHANT's performance and obligations under this Agreement to be provided by one of MERCHANT's owners or principals, or another individual acceptable to Paybotic in its sole discretion. Paybotic may also require an additional Cross-Corporate Guaranty from MERCHANT's parent company or an affiliated entity. MERCHANT must provide Paybotic with the fully executed Personal/ Cross-Corporate Guaranty (and Company Resolution Addendum for any Cross-Corporate Guaranty), attached to this Agreement and incorporated herein by this reference as though set forth in full, prior to this Agreement taking effect.

**8  General**

**8.1  Entire Agreement.** The Agreement is the complete and exclusive statement of the agreement between Paybotic and the Merchant with respect to the subject matter hereof and supersedes any prior agreement(s) between Paybotic and MERCHANT with respect to such subject matter.

**8.2  Amendment or Modification.** Except as otherwise provided herein, no provision of this Agreement may be amended or modified by MERCHANT except in a signed writing by Paybotic. Any amendment to this Agreement shall be effective the later of either the effective date contained in the notice of acceptance by Paybotic, fifteen (15) days after the notice is mailed, or when expressly agreed.

**8.3  Regulatory Amendment; Modifications.** In the event performance of the services provided herein would result in a violation of any present or future statute, regulation or government policy to which Paybotic and Sponsor are subject, and which governs or affects the transactions contemplated by this Agreement, then this Agreement shall be deemed amended to the extent necessary to comply with such statute, regulation or policy, and Paybotic and Sponsor shall incur no liability to MERCHANT as a result of such violation or amendment.

**8.4  Section Headings.** All Section headings are for descriptive purposes only. The language of each Section shall control.

**8.5  Notice.** Except as otherwise expressly provided herein, any written communication shall be delivered, or sent to the addresses provided above, unless another address is substituted by notice delivered or sent by Paybotic or MERCHANT, as provided herein. Except as otherwise expressly provided herein, any such notice shall be deemed given when received.

**8.6  Force Majeure.** Except when prevented from doing so by causes beyond its control, including, but not limited to Acts of God, strikes, mechanical or electrical breakdown, fire, flood, war, governmental action, accident, Paybotic shall process transactions in accordance with this Agreement.

**8.7  Telecopy.** A telecopy (fax), PDF or similar electronic transmission of a signed offer, acceptance, amendment, addendum, or notice shall be deemed the equivalent of the original document.

**8.8  Prohibition of Assignment and Delegation.** MERCHANT may not assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of Paybotic, which consent may be withheld in Paybotic's sole and absolute discretion. Despite Paybotic's consent, no assignment will release the MERCHANT from any of its obligations or alter any of its primary obligations to be performed under the Agreement. Any attempted assignment or delegation in violation of this provision is void or voidable at the option of Paybotic and will entitle Paybotic to terminate this Agreement immediately.

**8.9  Paybotic Assignment and Delegation.** Paybotic may assign any of its rights to or delegate any of its duties under this Agreement at any time.

**8.10  Waiver.** Paybotic may waive enforcement of any provisions of this Agreement. Any such waiver shall not affect Paybotic's rights with respect to any other transaction or modification of the terms of this Agreement.

**8.11  Binding Agreement; Benefit.** This Agreement shall be binding upon and to the benefit of the Parties hereto and their respective legal representatives, successors, and permitted assigns. This Agreement is not for the benefit of any other person, and no other person shall have any right against Paybotic or the MERCHANT hereunder.

**8.12  Severability.** In the event that any provision of this Agreement shall be determined to be invalid, illegal or unenforceable to any extent, the remainder of this Agreement shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

**8.13  Governing Law and Venue.** This Agreement shall be construed and enforced in accordance with the laws of the State of Florida, without regard to its conflicts of law provisions, in the United States, and the exclusive venue for any action, dispute or proceeding with respect to this Agreement shall be in the state or federal district court of Palm Beach County, Florida, and each of the Parties hereby consents, and expressly waives any objections, to jurisdiction and venue in Palm Beach County, Florida. The Parties specifically waive the right to a jury trial in connection with any dispute arising out of this Agreement, or between the Parties for any reason.

**8.14  Integrated Agreement.** This Agreement, along with the Merchant Application, and any Supplemental Application(s), Supplemental Terms, pricing addenda, and other supporting documents, is an integrated document that represents the complete terms of the Parties' agreement in their entirety, and supersedes any other agreements, written or oral, instruments or writings related to its subject matter.

**8.15  Attorneys' Fees.** Should either Party pursue an action in court or arbitration against the other regarding any provision of this Agreement, the prevailing Party shall be entitled to all costs incurred in connection with such action, including reasonable attorneys' fees.

**PIN DEBIT PROCESSING PROGRAM: SUPPLEMENTAL TERMS AND CONDITIONS** These Supplemental Terms and Conditions govern the PIN DEBIT PROCESSING PROGRAM selected by MERCHANT (referred to hereafter as the "DEBIT Processing Agreement"), and supplement the Merchant Processing Agreement between MERCHANT and Paybotic as follow:

**1.  Exclusive Processing Agent.** The relationship created by this DEBIT Processing Agreement is an exclusive processing relationship, and MERCHANT agrees to use the Paybotic Merchant Program(s) on an exclusive basis. The exclusivity provisions in Section 2 of the Merchant Agreement apply to this DEBIT Processing Agreement as if fully set forth herein. Paybotic will contract with one or more Vendors to settle funds accessed through MERCHANT's terminal, and Paybotic and Vendor will facilitate transfer of funds received from the Networks as a result of such DEBIT transactions. MERCHANT shall not allow any competing DEBIT services at the Location(s) without prior written approval from Paybotic, which approval may be withheld in Paybotic's sole discretion.

**2.  Setoff.** Paybotic may set off any amounts owed to Paybotic, Paybotic's affiliates and/or the Vendor in connection with MERCHANT's processing activity from any payments otherwise due to MERCHANT, whether or not arising out of or related to this Agreement.

**3.  Provisional Nature of Credits.** All credits to Merchant Bank Account, or other payments to MERCHANT, are provisional and are subject to, among other things, any chargebacks, fines, fees and losses incurred by Paybotic in connection with MERCHANT's processing activity, and any audit of such activity by Paybotic. MERCHANT agrees that Paybotic may debit or credit Merchant Bank Account(s) for any deficiencies, overages, fees and chargebacks, or may deduct such amounts from settlement funds due to MERCHANT. Alternatively, Paybotic may elect to invoice MERCHANT for any such amounts, which shall be due within fifteen (15) days from the invoice date, or on such earlier date as may be specified.

**4.  Funding Delays.** Paybotic will not be liable for any delays in receipt of funds or errors in debit and credit entries caused by third parties including, but not limited to, any Vendor, Network or MERCHANT's financial institution.

**5.  Change in Terms.** In addition to any other remedies available to Paybotic under this Agreement, MERCHANT agrees that, in the event of any default by MERCHANT, Paybotic may, with or without notice, change processing or payment terms, and/or suspend credits or other payments of any and all funds, money and amounts then due, or which may become due at any point in time, to MERCHANT pursuant to the terms of this Agreement, until Paybotic has investigated the facts and circumstances surrounding such default to its satisfaction.

**6.  Fee Assumptions.** MERCHANT shall be charged certain agreed upon fees for the merchant services provided by Paybotic hereunder, which shall be calculated and payable pursuant to this Agreement, and any additional pricing terms between the Parties. MERCHANT acknowledges that the agreed upon fees are based on the assumption that MERCHANT's transactions will qualify for certain reduced interchange levels. If a transaction fails to qualify for such anticipated interchange levels, then the Network will downgrade the transaction and process the transaction at a more costly interchange level for which it does qualify. In that event, MERCHANT shall be charged a Non-Qualified Interchange Fee, which is the difference in the interchange fee associated with the anticipated interchange level and the interchange fee associated with the interchange level at which the transaction actually was processed; plus, any applicable Non-Qualified Surcharge for each non-qualifying transaction, the amount of which is set forth in the service fee schedule. The fees set forth in this Agreement are also based upon

assumptions associated with the anticipated annual volume and average transaction size for all services as set forth in this Agreement and MERCHANT's method of doing business. If the actual volume or average transaction size are not as expected, or if MERCHANT significantly alters MERCHANT's method of doing business, Paybotic may adjust MERCHANT's discount fee and transaction fees without prior notice.

7. **Wires.** If MERCHANT elects to receive settlement funds by wire transfer, Paybotic may charge MERCHANT a wire transfer fee of up to $50 per wire.

8. **Settlement Account.** To the extent the Automated Clearing House ("ACH") settlement process is used to effect debits or credits to the Merchant Bank Account(s), MERCHANT agrees to be bound by the terms of the operating rules of the National Automated Clearing House Association, as in effect from time to time. MERCHANT hereby authorizes Paybotic to initiate credit and debit entries and adjustments to the Merchant Bank Account(s) through the ACH settlement process and/ or through direct instructions to the financial institution where the Merchant Bank Account(s) is maintained for amounts due under this Agreement and under any agreements with Paybotic or Paybotic's aaffiliates for any related services, as well as for any credit entries in error. MERCHANT hereby authorizes the financial institution where the Merchant Bank Account(s) is maintained to effectuate all such debits and credits to the Merchant Bank Account(s). This authority will remain in full force and effect until Paybotic has given written notice to the financial institution where the Merchant Bank Account(s) is maintained that all monies due under this Agreement and under any other agreements with Paybotic or its affiliates for any related services have been paid in full.

9. **Fines.** MERCHANT agrees to pay any fees and fines imposed on Paybotic or Sponsor by any Network/Association in connection with MERCHANT's processing activity, including but not limited to excessive chargeback fines.

10. **Adjustments.** If MERCHANT believes any adjustments should be made with respect to Merchant Bank Account(s), MERCHANT must notify Paybotic in writing within thirty (30) days after any debit or credit is, or should have been, made. If MERCHANT notifies Paybotic after such time period, Paybotic may, in its sole discretion, assist MERCHANT, at MERCHANT's expense, in investigating whether any adjustments are appropriate and whether any amounts are due to or from other parties, but Paybotic shall not have any obligation to investigate or effect any such adjustments. Any voluntary efforts by Paybotic to assist MERCHANT in investigating such matters shall not create any obligation to continue such investigation or any future investigation.

11. **Chargebacks.** MERCHANT shall be responsible for reimbursing Paybotic for all transactions submitted by MERCHANT that result in a chargeback. MERCHANT shall reimburse Paybotic for any chargebacks, return items, or other losses resulting from MERCHANT's processing activity. Reg-E Claims and transaction disputes will be emailed to the address on file. MERCHANT is required to provide a copy of the POS receipt for the disputed item, which must be signed by the Cardholder.

12. **Disclaimer of Warranty.** THIS AGREEMENT IS A SERVICES AGREEMENT. PAYBOTIC DISCLAIMS ALL OTHER REPRESENTATIONS OR WARRANTIES MADE TO MERCHANT OR TO ANY OTHER PERSON. EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, PAYBOTIC MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY OF THE PAYBOTIC SERVICES, RELATED PRODUCTS, SOFTWARE OR DOCUMENTATION. PAYBOTIC SPECIFICALLY DISCLAIMS ANY AND ALL WARRANTIES REGARDING QUALITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE OF ANY SERVICES OR ANY GOODS PROVIDED INCIDENTAL TO THE SERVICES PROVIDED UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, ANY SERVICES OR ANY GOODS PROVIDED BY A THIRD PARTY.

13. **Limitation of Liability.** IN NO EVENT SHALL PAYBOTIC, ANY PAYBOTIC AFFILIATE, SPONSOR, OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS, BE LIABLE TO MERCHANT, OR ANY PARTY CLAIMING BY, THROUGH, OR UNDER MERCHANT, FOR ANY INCIDENTAL, EXEMPLARY, PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES WHATSOEVER, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE, OR WHETHER ANY PARTY OR ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. PAYBOTIC SHALL NOT BE LIABLE TO MERCHANT OR ANY THIRD PARTY FOR ANY LOSS AND/OR DAMAGE CAUSED OR SUFFERED BY THE MERCHANT AND/OR SUCH THIRD PARTY IN CONNECTION WITH ANY UNAVAILABILITY OF THE SERVICES CONTEMPLATED BY THIS AGREEMENT. PAYBOTIC ASSUMES NO LIABILITY FOR DISRUPTIONS OR IMPROPER OPERATION OF THE SERVICE FOR ANY REASON, INCLUDING, BUT NOT LIMITED TO, VANDALISM, THEFT, ACTIONS OF THIRD PARTY SERVICE PROVIDERS, PHONE SERVICE OUTAGES, INTERNET DISRUPTIONS, EXTREME OR SEVERE WEATHER CONDITIONS OR ANY OTHER CAUSES IN THE NATURE OF "ACTS OF GOD" OR FORCE MAJEURE. IN NO EVENT SHALL THE TOTAL AGGREGATE LIABILITY OF PAYBOTIC FOR ANY AND ALL CLAIMS, LOSSES OR DAMAGES ARISING UNDER THIS AGREEMENT EXCEED THE TOTAL AMOUNT OF FEES ACTUALLY PAID TO PAYBOTIC BY MERCHANT DURING THE THREE (3) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT THAT GAVE RISE TO THE CLAIM, LOSS OR DAMAGE, OR TEN-THOUSAND DOLLARS (USD10,000), WHICHEVER IS GREATER, WHETHER OR NOT THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN OR CONTEMPLATED BY PAYBOTIC AFFILIATES, OR SPONSOR, AND REGARDLESS OF THE LEGAL OR EQUITABLE THEORY OF LIABILITY WHICH MAY BE ASSERTED. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, PAYBOTIC'S LIABILITY FOR ANY DELAY IN FUNDING TRANSACTIONS TO MERCHANT FOR ANY REASON WILL BE LIMITED TO INTEREST COMPUTED FROM THE DATE THAT MERCHANT SUBMITS THE TRANSACTION TO THE DATE THAT PAYBOTIC FUNDS THE TRANSACTION AT THE RATE OF THE FEDERAL FUNDS, AS ESTABLISHED BY THE FEDERAL RESERVE BOARD FROM TIME TO TIME, LESS ONE PERCENT (1%).

14. **Cardholder Information.** Except as otherwise required by law, MERCHANT shall not, without the cardholder's and Paybotic's prior written consent, sell, purchase, provide, or otherwise disclose the cardholder's account information or other cardholder information to any third party other than Paybotic, Sponsor or MERCHANT's agents and processing organizations for the purpose of assisting MERCHANT in its business, or in response to a valid government demand. MERCHANT shall comply with all applicable Payment Card Industry Data Security Standards (PCI-DSS) and Payment Application Data Security Standards (PA-DSS) at all times. This Section shall survive termination of this Agreement.

15. **Prohibition of Assignment and Delegation.** MERCHANT may not assign any of its rights, including the right to payment, or delegate any of its duties under this Agreement without the prior written consent of Paybotic, which consent may be withheld in Paybotic's sole and absolute discretion. In the event that MERCHANT makes an assignment (or provides a security interest) of receivables covered by this Agreement, then Paybotic may, at its option, elect to (a) refuse to acknowledge such assignment unless accompanied by an authorization to both initiate debits or credits to the bank account of the assignee, (b) terminate this Agreement immediately, or (c) charge for any transfers that Paybotic is called upon to make manually to fulfill such an assignment at the rate of $100 per transfer.

Despite Paybotic's consent, no assignment will release the MERCHANT from any of its obligations or alter any of its primary obligations to be performed under the Agreement. Any attempted assignment or delegation in violation of this provision is void or voidable at the option of Paybotic and will entitle Paybotic to terminate this Agreement immediately. MERCHANT shall indemnify and hold Paybotic harmless from all liabilities, chargebacks, expenses, costs, fees and fines arising from such transferee's or assignee's submission of card transactions to Paybotic for processing. The payment services provided by Paybotic require access to a single bank account in which Paybotic may initiate both credits and debits. MERCHANT may not enter into any agreement that would require, in any circumstance or event, the transfer of any payments or proceeds from card transactions covered by this Agreement to the custody or control of any third party.

16. **Termination.** Upon termination of this Agreement for any reason, MERCHANT's obligations shall include, but not be limited to, (a) payment of all applicable fees and charges for any services performed by Paybotic prior to the effective date of termination; (b) payment of any applicable Early Termination Fee; ; (c) payment of all costs and expenses incurred to collect amounts owed by MERCHANT to Paybotic; and (d) payment of any subsequent returned items from MERCHANT's use of the services. MERCHANT shall continue to bear total responsibility for all chargebacks, fees, credits and adjustments resulting from card transactions processed pursuant to this Agreement, and all other amounts then due, or which thereafter may become due, under this Agreement. Paybotic may hold MERCHANT's funds for a period of time in an amount sufficient to cover said financial obligations from the final deposit to the Merchant Bank Account. Within thirty (30) days of termination of this Agreement, MERCHANT shall return to Paybotic all materials that are the property of Paybotic and provided by Paybotic to MERCHANT, as part of the services contemplated here under, including, but not limited to software, hardware, manuals and instructions.

17. **Special Provisions for PIN Debit Card**

**17.1 PIN Debit Card Acceptance.** Most CHECK/ATM Cards (Debit Cards) can be accepted at the point of sale at participating locations. Examine the back of the PIN Debit Card to determine if the Card participates in a Network that MERCHANT is authorized to accept. Network mark(s) are usually printed on the back of the Card. If the PIN Debit Card is valid and issued by a participating Network, MERCHANT must comply with the following general requirements for all participating Networks, in addition to the specific requirements of the Network:

17.1.1 MERCHANT must honor all valid PIN Debit Cards when presented that bear authorized Network marks.
17.1.2 MERCHANT must treat transactions by Cardholders from all card issuers in the same manner.
17.1.3 MERCHANT may not establish a minimum or maximum transaction amount for PIN Debit Card acceptance.
17.1.4 MERCHANT may not require additional information, besides the Personal Identification Number, for the completion of the transaction unless the circumstances appear suspicious.
17.1.5 MERCHANT shall not disclose transaction related information to any party other than MERCHANT's agent, a Network, or issuing institution and then only for the purpose of settlement or error resolution.
17.1.6 MERCHANT may not process a credit card transaction in order to provide a refund on a PIN Debit Card transaction.

**17.2 PIN Debit Transaction Processing.** The following general requirements apply to all PIN Debit Card transactions:

17.2.1 All debit transactions must be authorized and processed electronically. There is no Voice Authorization or Imprinter procedure for PIN Debit Card transactions. MERCHANT may not complete a PIN Debit Card transaction that has not been authorized. If MERCHANT cannot obtain an Authorization at the time of sale, MERCHANT should request another form of payment from the customer or process the transaction as a Store and Forward or Resubmission, in which case MERCHANT assumes the risk that the transaction fails to authorize or otherwise declines. The Cardholder should be instructed to contact the Issuer to find out why a transaction has been declined.
17.2.2 MERCHANT may not complete a PIN Debit Card transaction without entry of the Personal Identification Number (PIN) by the Cardholder. The PIN must be entered into the PIN pad exclusively by the Cardholder. MERCHANT cannot accept the PIN from the Cardholder verbally or in written form.
17.2.3 The PIN Debit Network used to process MERCHANT's transaction will depend upon, among other things, the availability of the Network at the time of the transaction, whether a particular PIN Debit Card is enabled for a particular Network and the routing requirements established by the Networks and the card issuers. Paybotic may, at its sole discretion, utilize any PIN Debit Network available for a given transaction.
17.2.4 MERCHANT must issue a receipt to the Cardholder upon successful completion of a transaction. The Cardholder account number will be masked so that only the last four digits will appear. The masked digits will appear as a non-numeric character such as an asterisk. This is referred to as PAN truncation.
17.2.5 MERCHANT may not manually enter the account number. The account number must be read electronically from the Magnetic Stripe. If the Magnetic Stripe is unreadable, MERCHANT must request another form of payment from the customer.
17.2.6 Any applicable tax must be included in the total transaction amount for which authorization is requested. Tax may not be collected separately in cash.
17.2.7 MERCHANT IS RESPONSIBLE FOR SECURING MERCHANT'S TERMINALS AND INSTITUTING APPROPRIATE CONTROLS TO PREVENT EMPLOYEES OR OTHERS FROM PROVIDING CASH ADVANCES ON DECLINED OR CANCELLED TRANSACTIONS. MERCHANT MUST ADVISE CARDHOLDER TO CONTACT THE ISSUER IF THERE IS A DISCREPANCY.
17.2.8 Approved transactions cannot be voided or refunded through the terminals.

---

**By signing the Merchant Processing Agreement Application(s), MERCHANT accepts and agrees to be bound by these complete terms and conditions as of the Effective Date on condition of Paybotic Acceptance. Absent Paybotic Acceptance, this Agreement shall have no force or effect, and shall not be binding on MERCHANT or Paybotic**

# EXHIBIT B

8/13/2024

**Via U.S. Mail and E-Mail**
Blair Wellness
Attn: Matthew Blair, Owner
5806 York Rd, Baltimore, MD 21212
blairwellnesscenter@gmail.com

Re:   Notice of Termination – Early Termination Fee

Dear : Matthew Blair,

We received your request to terminate Services under the Merchant Processing Agreement with IPN, LLC which does business as Paybotic (the "**Merchant Agreement**"), which went effective 2/4/2021 (the "**Effective Date**").

A termination without cause by you, or for your convenience, constitutes an anticipatory breach of the "**Exclusivity**" clause set forth in Section 2.2 of the Merchant Agreement, and requires payment of the "**Early Termination Fee**" specified in Section 5.4 of the Merchant Agreement.

Under Section 5.4, the Early Termination Fee is equal to the average monthly processing fees charged to Blair Wellness for the previous six (6) months multiplied by the number of months remaining under the term of the Merchant Agreement. The Early Termination Fee shall apply to each location serviced by Paybotic, under each Merchant Agreement. Based on our records, the average monthly processing fees for the previous six (6) months were $16,017.00 for Blair Wellness location.

There are thirty (30) months remaining in the current Term of the Merchant Agreement from 8/8/2024, the date that we received your request to terminate the Merchant Agreement, through 2/4/2026, the date that the current Term of the Merchant Agreement was scheduled to end. Therefore, the Early Termination Fee is $480,510.00.

In the event that you pursue a payment processing relationship with a merchant service provider other than Paybotic (an "**Alternate Provider**"), you agree to present Paybotic with a fee schedule setting forth the rates provided by the Alternate Provider and grant Paybotic five (5) business days from the date of our receipt of the fee schedule to match or better the rates proposed by the Alternate Provider. The Early Termination Fee shall still apply if you elect to engage an Alternate Provider to provide merchant services in violation of the Exclusivity clause under the Merchant Agreement. Notwithstanding the foregoing, if you do not execute a new agreement for similar merchant services with an Alternate Provider within twelve (12) months from the date of your request to terminate the Merchant Agreement, we shall waive the Early Termination Fee and refund any amounts withheld or otherwise deducted.

Pursuant to the Merchant Agreement, we will withhold settlement funds and apply them to the Early Termination Fee until it is paid in full. We may also deduct the

Matthew Blair
8/13/2024
Page 2

remaining Early Termination Fee from your business bank account on file with us. Even if a portion of the Early Termination Fee is paid, we may pursue all other available remedies to us and do not waive any such remedies.

If you would like to make other arrangements to pay the Early Termination Fee or restart processing with Paybotic, please contact us.

    Sincerely,
    ………………………………